hWALTZER, Judge.
Russell Harris and Terrance Johnson appeal their convictions and sentences for possession of crack cocaine.
STATEMENT OF CASE
The State filed two separate bills of information. In count one of those bills (regarding activities on 9 October 1998), the State charged Russell Harris and co-defendant, Terrance Johnson[1], with one *407 count each of possession with intent to distribute crack cocaine, a violation of LSA-R.S. 40:967(B); additionally, count two of that bill, charged Russell Harris with one count of possession of twenty-eight to two hundred grams of cocaine, a violation of LSA-R.S. 40:967(F)1. In the second bill of information (regarding activities on 17 January 1999), the State charged Terrance Johnson with one count of possession with intent to distribute crack cocaine.
At their arraignments, Harris and Johnson pled not guilty to all charges.
On 29 June 1999, a twelve-member jury found Harris guilty of possession with intent to distribute and possession twenty-eight to two hundred grams of cocaine and Johnson guilty of possession with intent to distribute and attempted possession with intent to distribute.
The court sentenced Harris on count one to fifteen years at hard labor, the first five years without benefit of probation, parole or suspension of sentence, with credit for time served. As to count two, the court sentenced |2him to fifteen years at hard labor, without benefit of probation, parole, or suspension of sentence, with credit for time served, sentences to run concurrently. That same day, the State filed a multiple bill of information to which Harris pled not guilty. On 3 December 1999, the court adjudged him a fourth offender, vacated his original sentences, and sentenced him to life imprisonment at hard labor, as to each count, without benefit of parole, probation or suspension of sentence, with credit for time served, sentences to run concurrently.
On 7 September 1999, the court sentenced Johnson, on the conviction for possession with intent to distribute, to seven years at hard labor, with the first five years to be served without benefit of parole, probation or suspension of sentence, and on the conviction for attempted possession with intent to distribute, the court sentenced him to seven years at hard labor, with credit for time served, sentences to run concurrently.
STATEMENT OF FACTS
Detective Michael Lohman, NOPD officers and DEA Agents participated in obtaining a search warrant for, and conducting surveillance of, C & G Liquor store, located in the 5500 block of North Galvez Street. At approximately 1:30 p.m. on 9 October 1998, Detective Lohman observed Terrance Johnson, one of the targets of the investigation, loitering in front of the liquor store. Detective Lohman noted several instances where a subject would approach Johnson, engage in brief conversation, and then enter the Lstore followed by Johnson. Moments later the individual would exit the store, not carrying any items, and then leave the area. Johnson would then resume loitering in front of the store, counting money in his hands, until the next subject approached him. Based on these observations, Detective Lohman suspected narcotics activity. Shortly before 2:00 p.m., Russell Harris arrived in a black Mitsubishi Diamonte accompanied by Mario Breedlove. Both men entered the store followed by Johnson. Shortly thereafter, Johnson exited the store and-resumed his suspect behavior. Satisfied there was drug activity at the location, Detective Lohman signaled back up officers to execute the warrant.
Johnson walked across the street to another store where he was intercepted by officers and returned to the target location. As officers entered C & G they encountered four individuals behind the counter, who were secured, and advised of the search warrant. Detective Lohman advised the detainees of their Miranda rights, placed them under arrest, and began searching the store. Officers found a “slab” of rock cocaine and $191 in the cash *408 register, A search of the beverage cooler yielded 23 grams of crack cocaine. Russell Harris, Terrance Johnson, Greg Morris and Mario Breedlove were arrested for possession of cocaine.
Searching the store farther, the officers discovered a razor blade containing a white residue; two cigar boxes containing glass tubes, wire mesh and small plastic bags, items common to narcotics consumption and ^packaging; one digital and twelve handheld metal scales. Harris told Detective Lohman that he owned the store, and lived with his mother at 2516 Mazant Street. Harris agreed to cooperate in the investigation, and signed a consent to search form, allowing the search of his residence. However, the Mazant Street address was a gutted building.
After conferring with Sgt. Little, the officers and Harris relocated to 2210 Alabo Street where Detective Lohman noticed Harris’ black Mitsubishi Diamonte parked in the driveway, and encountered Lakesha James, Harris’ common-law wife, exiting the residence. James verified that Harris lived with her at that address, but became uncooperative and belligerent upon learning of the investigation and the detective’s suspicions that additional narcotics were being stored in the residence.
Sgt. Little returned to headquarters to obtain' a search warrant for the house while other officers secured the premises. However, prior to issuance of the warrant, James agreed to cooperate with the investigation, and signed a consent to search form allowing the officers to search the residence. She unlocked the security bars on the front door, escorted the officers to the master bedroom where she unlocked a dead bolt on the bedroom door, and directed Detective Lohman to a .38-caliber revolver under the mattress. She denied the presence of any narcotics in the house; however officers seized approximately fifty-four grams of crack cocaine from atop the bedroom dresser and a bag of glass tubes. In addition, Detective Lohman eon-fiscated |san invoice and subpoena, both addressed to Russell Harris at 2210 Alabo Street, and a photograph of Harris and James. While at the Alabo Street residence, Detective Lohman obtained a set of keys from Harris. One key unlocked the security bars on the front of the residence; a second key fit the front door of the residence, .and the third key operated the dead bolt on the master bedroom. Upon completion of the residence search, all of the defendants were transported to the police station for processing. Officers seized $376.00 from Greg Morris, $121.00 from Russell Harris and $79.00 from Terrance Johnson, who had a seizure at the station, and was transported to Charity Hospital for treatment. Some time later, Charity Hospital gave Detective Lohman a plastic bag containing several pieces of cocaine.
Dr. Kathleen Hubbel testified by stipulation as an expert in the field of emergency medicine. She stated that Terrance Johnson arrived at Charity Hospital on 9 October 1998, with complaints of possible seizure. He exhibited rapid heartbeat, elevated blood pressure, and tremors and told her that he had ingested the equivalent of fifty rocks of cocaine several hours before his arrival at the hospital. In the course of having his stomach pumped, Johnson disgorged a small plastic bag containing rock-like pieces of a white substance, which Dr. Hubbel turned over to the police.
Officer Kenneth Cureau testified that he assisted in the search of C & G liquor store. The only evidence he recovered was the bag of cocaine from the beverage cooler. He also stated that he accompanied Terrance Johnson | fito Charity Hospital after he had a seizure and fell out of a chair striking his head. En route to the hospital, Johnson told Officer Cureau that he swallowed a quarter ounce of crack cocaine. After Dr. Hubbel treated Johnson, she gave Officer Cureau a bag of cocaine pumped from Johnson’s stomach. He turned the bag over to the evidence room.
*409 Detective Barret Morton testified that he participated in the investigation of the C & G liquor store. He detained Terrance Johnson and patted him down. He also stated that he assisted in the search of the Alabo Street residence, and recovered a bundle of glass tubes. Detective Morton met Lakesha James and heard her say that Russell Harris lived at that address. He was one of the officers who received the bag of cocaine that Charity Hospital pumped from Terrance Johnson’s stomach.
Michael Christopher Cooley, special agent with the Drug Enforcement Administration, testified that he, fellow agent Michael Aston and other DEA agents assisted Detective Lohman and the NOPD with them investigation of the C & G liquor store. Agent Cooley helped search the liquor store. He opened the cash register, located the cocaine and currency, and alerted Detective Lohman. He helped secure the premises. He relocated to the 2210 Aabo Street residence with other officers, but did not enter the premises.
Sgt. Bruce Little testified that he was the supervising officer in the C & G liquor store case, but Detective Lohman was the case agent. Sgt. Little l7was part of the take down force assisting Lohman and was the first officer inside the liquor store. He entered the store under the guise of investigating a recent burglary at the store, and asked to speak with the owner. Russell Harris responded that he was the owner. On a pre-arranged signal, takedown officers entered the store and helped secure the defendants. Sgt. Little made a sweep of a back room for security purposes. The officers informed the defendants of their rights, gave Russell Harris a copy of the warrant and proceeded to search the premises. Sgt. Little saw the contraband and other evidence seized pursuant to the warrant. After completing the search of the liquor store, Sgt. Little went to the 2210 Aabo Street residence. He saw Russell Harris’ black Diamonte parked in the driveway. He explained the police presence to James, and when she refused to cooperate, he left to secure a search warrant for the residence. Prior to obtaining the warrant, he was summoned to the residence because James signed a consent to search form. At this point, Sgt. Little’s •testimony tracked Detective Lohman’s recounting the search and seizure of contraband from the residence.
Officer Melody Young testified that she and Sgt. Eddie Selby were on routine patrol on 17 January 1999, in a marked police vehicle on Caffin Avenue. As they approached the intersection of Caffin Avenue and Galvez Street, they saw Terrance Johnson standing on the corner talking with several black males. Officer Young witnessed Johnson engage in what she believed was a hand to hand drug transaction. The officers stopped and the | Ssuspects fled. Johnson walked into a nearby store. She entered the store, saw Johnson standing at the counter with his hand partially out of his pocket with a plastic bag protruding from his pocket. As she handcuffed Johnson, she told him he was under investigation for drug trafficking. Incident to his arrest, she recovered twenty-one pieces of crack cocaine and $31.
Sgt. Eddie Selby testified, corroborating Officer Young’s testimony.
Officer William Giblin, NOPD criminalist and expert in the field of analysis and classification of controlled dangerous substances, testified that the rock-like substances seized pursuant to Terrance Johnson’s 17 January 1999 arrest tested positive for cocaine.
Officer Harry O’Neal, drug chemist with the NOPD crime lab and expert in the analysis of controlled dangerous substances, was further qualified as an expert in the identification of drug paraphernalia and the use, packaging and distribution of controlled dangerous substances, particularly cocaine. Officer O’Neal explained his testing methods on the contraband seized from the C & G liquor store and the Aabo Street residence. The evidence tested positive for cocaine. He further testified *410 that in his twelve and a half years of police experience with controlled substances, the type of scales confiscated at the liquor store are frequently used to weigh contraband before packaging. Upon examination of the glass tubes, copper mesh wire and plastic bags seized in the search of the liquor store and residence, Officer O’Neal said that the objects were the type associated with drug | sparaphernalia. Further explaining “drug paraphernalia”, the officer testified that wire mesh and glass tubes are used in making crack pipes and the scales and plastic bags are employed in packaging drugs, particularly cocaine and marijuana, for street sale. For “demonstrative purposes” Officer O’Neal displayed crack pipes from other cases to show how the pipe is constructed from glass tubes and wire mesh.
Darryl Harrell, a defense witness, testified he is a cosmetologist and that on 9 October 1998, at approximately 12:80 p.m. he was getting off the bus near the C & G liquor store. Greg Morris, Terrance Johnson and Mario Breedlove were at the liquor store. Greg Morris called to Harrell to come fix his hair. While attending to Morris, Russell Harris came in and asked him to fix his hair. Harrell told Harris he (Harris) would have to get hair supplies. Harrell was in the back of the store busy with Morris when Harris and Greg Morris left the store for hair supplies. Harris and Morris did not return until about five minutes before Detective Lohman arrived. As Harrell was leaving the liquor store to get a hair dryer, Detective Lohman came in asking for the owner of the store. Harrell directed him to the back of the premises, but instead of leaving, the detective forced his way into the store and refused to allow anyone to leave because they were under investigation. Detective Lohman did not identify himself as an officer.
Lakeesha James testified that she lived at 2210 Alabo Street with her two daughters. Russell Harris is her daughters’ father. On the day he was |10arrested, she went to the liquor store and removed the Diamonte vehicle to her driveway. Shortly afterward, Detective Alston came to her house and asked to speak with her. She spoke to him about one hour during which time he told her to ask the five adults and five children visiting her to leave the house. Detective Lohman arrived and told her if she did not allow the police to enter her house, he would get a warrant. When she refused him entrance, Detective Loh-man attempted to grab her keys. She and Lohman argued. Sgt. Little arrived and joined the conversation. The officers threatened to take everyone in the house to jail if she did not cooperate and contraband was found in the house. She signed a consent to search form and unlocked the front gate and the door to her bedroom. The officers found the .38 caliber gun where she told them it would be, and then made her step back into the front of the residence while they searched the house. She said that Russell Harris did not live with her and did not have keys to her house. She further stated that she had never seen any of the items the officers said they found in the search.
Joycelyn Harris, Russell Harris’ mother, testified that she was at Lakeesha James’ house the afternoon her son was arrested. Lakeesha James is her son’s ex-girlfriend; they have two children. The police were already at Lakeesha’s house when Joyce-lyn Harris arrived. When James allowed the police to enter her house, Joycelyn Harris accompanied them and saw In one officer enter the house carrying a black bag. Harris testified that her son worked at C & G liquor store.
Cathryn Williams testified that she was visiting Lakeesha James on 9 October 1998. A man came to the back of the house and told her to open the door. Shortly afterward, the police arrived and told everyone to leave the house. James and Joycelyn Harris went back into the house with the police.
Sgt. Bruce Little was re-called on behalf of the State. He testified that when he entered the C & G liquor store, he identi *411 fied himself as a burglary detective. At that point one of the three people behind the partition opened the door. He produced identification, and asked to speak to the owner. Russell Harris identified himself as the owner. Sgt. Little then gave the prearranged signal to the take down team and the rest of the agents entered the building. The sergeant explained that Agent Alston entered the Alabo Street location carrying his black briefcase, containing rubber gloves, evidence bags, tape recorder, notebook, etc., but no drugs. After searching Lakeesha James’ house, she ^ ™ was released because he could find no connection between her and the contraband found in her house.
ERRORS PATENT
A review for errors patent on the face of the record reveals a sentencing error as to each defendant.
The State filed a multiple bill against Russell Harris as a fourth offender on the basis of his conviction for possession of twenty-eight to two | ^hundred grams of cocaine, count two of the bill of information. However, in sentencing him as a multiple offender, the trial court imposed a life sentence without benefit of parole, probation or suspension of sentence, on count two and, erroneously, on count one also, even though the conviction on count one was not part of the multiple bill. Moreover, prior to sentencing Harris as a multiple offender, the court vacated his original sentences; thus, Harris has no legal sentence as to count one.
On Terrance Johnson’s conviction for attempted possession with intent to distribute cocaine, the court sentenced him to “seven years at hard labor.” LSA-R.S. 40:979 provides that upon conviction punishment will be “in the same manner as for the offense planned or attempted, but such fine or imprisonment shall not exceed one-half of the punishment prescribed for the offense, the commission of which was the object of the attempt ...”. Possession with intent to distribute, the offense attempted, requires that a portion of the sentence be served without benefits. LSA-R.S. 40:967. Hence, the combination of LSA-R.S. 40:979 and LSA-R.S. 40:967 would require that a portion of the attempt sentence be served without benefits. The court’s failure to direct that any of Johnson’s attempt sentence be served without benefits appears to be illegally lenient. However, because the state failed to appeal this issue, the court will not correct the sentence. State v. Fraser, 484 So.2d 122 (La.1986).
110JIARRIS-ASSIGNMENTS OF ERROR NUMBERS 1,2 AND 3
In his first three assignments, Harris contends the jury erred in finding him guilty and the trial court erred in denying his post verdict motion for acquittal and motion for new trial. The thrust of his three arguments is that the evidence adduced at trial is insufficient to support his conviction.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such *412 evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentia-ry guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
To support defendant’s convictions, the State must prove that the defendant “knowingly” and “intentionally” possessed the cocaine with the “intent to distribute”. State v. Williams, 594 So.2d 476, 478 (La.App. 4 Cir.1992). Specific intent to distribute may be established by proving circumstances surrounding defendant’s possession which give rise to a reasonable inference of intent to distribute. State v. Dickerson, 538 So.2d 1063 (La.App. 4 Cir.1989).
In State v. Hearold, 603 So.2d 731, 735-36 (La.1992), the Louisiana Supreme Court stated:
Intent is a condition of mind which is usually proved by evidence of circumstances from which intent may be inferred. State v. Fuller, 414 So.2d 306 (La.1982); State v. Phillips, 412 So.2d 1061 (La.1982); La.Rev.Stat. 15:445. In State v. House, 325 So.2d 222 (La.1975), this court discussed certain factors which are useful in determining whether circumstantial evidence is sufficient to prove the intent to distribute a controlled dangerous substance. These factors include (1) whether the defendant ever distributed or attempted to distribute the drug; (2) whether the drug was in a form usually associated |1swith possession for distribution to others; (3) whether the amount of drug created an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant’s possession is inconsistent with personal use only; and (5) whether there was any' paraphernalia, such as baggies or scales, evidencing an . intent to distribute. '
* * *
In the absence of circumstances from which an intent to distribute may be inferred, mere possession of a drug does not amount to evidence of intent to distribute, unless the quantity is so large that no other inference is possible. State v. Greenway, 422 So.2d 1146 (La.1982); State v. Harveston, 389 So.2d 63 (La.1980); State v. Willis, 325 So.2d 227 (La.1975).
In State v. Cushenberry, 94-1206 p. 6 (La.App. 4 Cir. 1/31/95); 650 So.2d 783, 786, this court described the Hearold factors as “useful” but held that the evidence need not “fall squarely within the factors enunciated to be sufficient for the jury to find that the requisite intent to distribute.”
In the present case, Detective Loh-man testified that he was in charge of the investigation of the C & G liquor store. Pursuant to a search of the target location, officers found a “slab” of cocaine in the cash register and twenty-three grams of cocaine in the cooler. Moreover, in searching defendant Harris’ residence, investigators retrieved another fifty-four grams of cocaine from the bedroom Harris shared with his common-law wife. Additionally, the officers confiscated from both the liquor store and residence a combination of metal scales, boxes of glass tubes, wire mesh and plastic bags. After being qualified as an expert in the field of narcotics | ^packaging, Officer O’Neal testified that the metal scales, glass tubes, etc. were commonly used in the retail sale and packaging of crack cocaine. All of this paraphernalia points to the distribution or *413 the intent to distribute a controlled dangerous substance. Although Harris disclaimed ownership of the liquor store and denied residing at the Alabo Street residence, Detective Lohman and Sgt. Little testified that Harris identified himself to both officers as the owner of the liquor store. As for Harris’ residency, Detectives Lohman and Morton testified that Lakeesha James verified that Harris lived with her and their two daughters at the Alabo Street address. Moreover, Detective Lohman stated that a set of keys he retrieved from Harris’ pants pocket unlocked the security bars on the front door and the dead bolt on the master bedroom door at the Alabo Street address.
The evidence seized, coupled with the testimony of Detective Lohman, Sgt. Little and Officer O’Neal, enabled the jury to find beyond a reasonable doubt that Harris possessed between twénty-eight to two hundred grams of cocaine, and that he possessed the cocaine with intent to distribute.
HARRIS-ASSIGNMENTS OF ERROR NUMBERS 4 AND 5
Harris’ assignments, numbers 4 and 5, contest his habitual offender adjudication, arguing that the guilty pleas in two predicate convictions are defective. He contends that in the absence of any evidence the judge complied with LSA-C.Cr.P. art. 556.1, as to advising him of the minimum/maximum sentences to which he was exposed, prior to accepting |17his pleas, there is no proof the guilty pleas were knowing and voluntary. Moreover, he contends the State failed to prove his identity as to the third predicate offense.
Where a prior conviction resulted from a guilty plea, the State must show that the defendant was advised of his constitutional rights and that he knowingly waived those rights prior to the guilty plea, as required by Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). State v. Shelton, 621 So.2d 769 (La.1993). If the defendant denies the allegations of the bill of information, the State has the burden of proving the existence of the prior guilty pleas and that defendant was represented' by counsel. Shelton, supra, at 779. Once .the State meets this burden, defendant must produce some affirmative evidence of an infringement of his rights or of a procedural irregularity. Thereafter, the State must prove the constitutionality of the plea. Id.
In proving the constitutionality of the plea, the State must produce either a “perfect” transcript of the Boykin colloquy between the defendant and the trial judge or any combination of (1) a guilty plea form, (2) a minute entry, or (3) an “imperfect” transcript. Shelton, supra, at 780. If anything less than a “perfect” transcript is presented, the trial court must weigh the evidence submitted by the defendant and the State to determine whether the State met its burden of proof that defendant’s prior guilty plea was informed and voluntary. Id.
|1sThe record indicates that the defendant pled guilty on 15 March 1994, to public bribery, LSA-R.S. 14:118, and to attempted possession of a firearm while in possession of narcotics, LSA-R.S. 14:27, 14:95(E), on 9 September 1998. At the multiple bill hearing in this case, the State introduced the bills of information, fingerprint records, minute entries, and the waiver of rights form for each of the two predicate guilty pleas alleged by the State. The waiver of rights forms are signed and initialed in the appropriate places by the defendant, defense counsel and the judge. The respective minute entries recite that the judge verbally advised the defendant of, and that the defendant understood, his constitutional rights, more particularly the right to trial by judge or jury; the right to appeal; the right to confront and cross-examine the witnesses against him, and his privilege against self-incrimination now and at the time of the trial. It appears the State satisfied its burden of proving the constitutionality of the defendant’s guilty pleas. However, the defendant complains *414 there is no evidence that the judge complied with LSA-C.Cr.P. art. 556.1 by advising him of the minimum/maximum sentences to which he was exposed, prior to accepting his guilty pleas.
LSA-C.Cr.P. art. 556.1(A)(1) provides as follows:
A. In any criminal case, the court shall not accept a plea of guilty or nolo con-tendere, without first addressing the defendant personally in open court and informing him of, and determining that he understands, all of the following:
(1) The nature of the charge to which the plea was offered, the mandatory minimum penalty provided by law, if any, and the ^maximum possible penalty provided by law.
Since LSA-C.Cr.P. art. 556.1 did not take effect until 15 August 1997, only the 1998 guilty plea is impacted by the statute. The defendant argues that without benefit of a plea colloquy, and in the absence of notation on the waiver of rights form addressing the minimum/maximum sentence, there is no assurance the judge complied with LSA-C.Cr.P. art. 556.1, therefore his 1998 plea cannot be used as a predicate to multiple bill him.
In State v. Guzman, 99-1528 (La.5/16/00); 769 So.2d 1158, the Supreme Court adopted the harmless error test for violations of LSA-C.Cr.P. art. 556.1. In this case, the defendant pled guilty to attempted possession of a firearm while in possession of a dangerous substance, LSA-R.S. 14:27, 14:95, which carries a fine of not more than five thousand dollars and imprisonment at hard labor for not more than five years, without benefit of parole, probation or suspension of sentence.[2] The documentation supporting the 1998 guilty plea indicates that the defendant was represented by counsel, advised of his three Boykin rights, informed of the nature of the offense of which he was charged, represented that he had not been forced, threatened or coerced in any way to render his guilty plea and understood the nature of the proceedings. The trial judge accepted his guilty plea, finding that there was a factual basis for it and sentenced the | ^defendant to time served. Although the State did not produce a transcript of the guilty plea colloquy, the waiver of rights form indicates a possible term of imprisonment of “0 to 5 years”. Considering the documentation supporting the guilty plea, the failure to produce the plea colloquy was harmless error.
Harris argues that the State failed to prove his identity as to the third predicate offense.
To obtain a multiple bill conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. State v. Hawthorne, 580 So.2d 1131 (La.App. 4 Cir.1991). The identity may be shown by a variety of methods, including the testimony of witnesses, expert opinion regarding the fingerprints of the defendant when compared with those in the prior record, or photographs in the duly authenticated record. State v. Curtis, 338 So.2d 662 (La.1976).
The third predicate the State relied upon on in multiple billing the defendant stemmed from his 1989 conviction for simple possession of cocaine. At the multiple bill hearing, Officer Raymond Lucemore testified that he took the defendant’s fingerprints the morning of the multiple bill hearing. He identified those fingerprints as State’s exhibit K. Next, he identified a packet of certified documents detailing the defendant’s arrest and prosecution for simple possession of cocaine in 1989. Included in the packet was the bill of information, arrest register with fingerprints, minute L, entries and docket master. Officer Lucemore compared the fingerprints on exhibit K with the fingerprints on the *415 certified copy of the arrest register and concluded that the prints were made by one and the same person, Russell Harris. In light of Officer Lucemore’s testimony, the State carried its burden of proof.
HARRIS-ASSIGNMENT OF ERROR NUMBER 6
In his final assignment of error, the defendant argues that the trial court erred in denying his motion for mistrial based upon repeated references to prior “bad acts”.
The defendant complains of four incidents that occurred during the course of the trial. Two of the instances occurred during Sgt. Bruce Little’s testimony:
Q... .upon execution of the warrant, ... tell the ... jury what happened?
A. ...Having been in the location on numerous occasions, ...
Q... .why did you give the address of 2210 Alabo Street to Detective Mike Lohman?
A... .My prior investigations or the investigation leading up to this case had indicated — ■
The other two instances the defendant complains of arose during Sgt. Eddie Sel-by’s testimony:
Q. Can you tell the ... jury what you saw on that date leading up to his [Terrance Johnson] arrest?
A... .This particular store is quite familiar to us from the past for narcotics violations.
A. Based on previous information ...
|220n each of the four occasions, defense counsel objected and unsuccessfully moved for mistrial.
A mistrial is warranted under LSA-C.Cr.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant’s rights that even a jury admonition cannot provide a cure. State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94. Potentially damaging remarks include direct or indirect references to another crime committed or alleged to have been committed by the defendant, unless that evidence is otherwise admissible. LSA-C.Cr.P. art. 770(2). The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made; and, the comment must not arguably point to a prior crime and must unmistakably point to evidence of another crime. State v. Edwards, 97-1797 (La.7/2/99); 750 So.2d 893. In addition, the imputation must unambiguously point to the defendant; and, the defendant bears the burden of proving that a mistrial is warranted. Id. If the elements of Article 770 have not been satisfied, the decision on the motion for mistrial is governed by LSA-C.Cr.P. art. 771; and, whether a mistrial is warranted under the circumstances is within the sound discretion of the trial judge. Id. A police officer is not considered a court official under Article 770; and, absent a showing of a pattern of unresponsive answers or improper intent by |22the prosecutor, a mistrial is not warranted. State v. Nicholson, 96-2110 (La.App. 4 Cir. 11/26/97); 703 So.2d 173, mit denied 98-0014 (La.5/1/98); — So.2d -, 1998 WL 234690.
A reading of the above-quoted passages does not indicate that the prosecutor deliberately elicited the remarks supplied by the officers. The prosecutor tailored his questions to the investigation upon which the prosecution was based. However, the officers provided unsolicited information. Nevertheless, inasmuch as the police officers are not court officials, it does not appear the trial court erred in refusing to grant an automatic mistrial under LSA-C.Cr.P. art. 770.
Since the defendant was not entitled to a mistrial under Article 770, the applicable article is Article 771, which provides that the trial court can grant a mistrial if an admonition is not sufficient to assure the defendant of a fair trial when a *416 witness makes an irrelevant or immaterial remark or comment of such a nature that it might create prejudice against the defendant in the mind of the jury. The decision to grant a mistrial or to give an admonition is within the sound discretion of the trial court, and the court’s ruling on whether to grant a mistrial for a comment by a police officer referring to other crimes evidence should not be disturbed absent an abuse of discretion. State v. Nicholson, supra at 180. A mistrial is warranted if substantial prejudice will result which deprives the defendant of a fair trial. State v. Manuel, 94-0087, 94-0088 (La.App. 4 Cir.11/30/94); 646 So.2d 489.
In State v. Sartain, 98-0378 (La.App. 4 Cir. 12/13/99); 746 So.2d 837 this court considered a testifying officer’s comments that the defendant was living in a crack house and using drugs. The court concluded that although the officer’s statement that the defendant was going in the house and “using drugs” was an unambiguous reference to a specific crime, there was no indication that this indirect comment made it impossible for defendant to have obtained a fair trial.
In this case, although one of the officer’s comments unambiguously refers to “past narcotics violations”, the comment is made with reference to a location, not either of the defendants. It does not appear the trial judge abused his discretion in denying a C.Cr.P. art. 771 mistrial. Moreover, even assuming the trial court erred in denying the motion for mistrial, considering the amount of evidence in this case, such error was harmless. This assignment is without merit.
JOHNSON-ASSIGNMENT OF ERROR
In a sole assignment, Johnson contends the trial court erred in allowing the State’s expert to render an opinion as to an ultimate issue of fact. The defense objected to the State’s qualifying Officer Harry O’Neal as an expert in the identification of drug paraphernalia and the use, packaging and distribution of cocaine on the basis that this type of testimony should not be labeled as expert “value”.
| ^During his testimony, Officer O’Neal reviewed the evidence retrieved, including the quantity of cocaine found on the defendants, and the scales, baggies and glass tubes. The officer testified that the items were consistent with distribution. The defendant argues that this testimony constituted giving an opinion on an ultimate issue of guilt, the intent to distribute, in violation of the holdings in State v. Montana, 421 So.2d 895 (La.1982); State v. Wheeler, 416 So.2d 78 (La.1982); State v. White, 450 So.2d 648 (La.1984), State v. Evans, 593 So.2d 900 (La.App. 4 Cir.1992), writ denied 598 So.2d 371 (La.1992), and State v. Dabney, 452 So.2d 775 (La.App. 4 Cir.1984).
LSA-C.E. art. 702 provides that “[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
In Wheeler, the defendant was charged with possession of marijuana with the intent to distribute. The prosecutor asked the police officer-expert a hypothetical question in which the details exactly mirrored the facts of the case. The expert was then asked, in his expert opinion “... what is the likelihood of this [hypothetical] individual being involved in the distribution of marijuana” to which he replied “[i]n my opinion the person would be involved in the distribution of marijuana ...” Wheeler, supra at 79. On | ^appeal, the Louisiana Supreme Court found that the trial court had erred when it overruled the defendant’s objection to the hypothetical question because the testimony “was tantamount to an opinion that the defendant was guilty of the crime charged, an indirect abstract inference as to the ultimate issue in the case.” Wheeler, supra at 81.
*417 In State v. Montana, the court held that where an expert gives his opinion as to the ultimate issue of the defendant’s guilt, i.e. whether the defendant intended to distribute drugs, he has improperly usurped the function of the jury. The court in Montana found reversible error where a police officer, qualified as an expert in the packaging and distribution of illegal drugs, was given a factual situation similar to the circumstances surrounding the defendant’s arrest, and the officer gave his opinion that “they [the defendants] had it for sale.” Montana, supra at 900.
Likewise in State v. White, the State posed a hypothetical factual situation virtually identical to the actual evidence produced at defendant’s trial. The officer testified that in his opinion, “a person standing on the street corner with a matchbox containing say twenty-seven tin foils containing heroin, would be there for the purpose of selling or distributing.” Once again, the court found reversible error concluding that the officer was usurping the jury’s function as finder of fact.
In State v. Evans, this court reversed the defendant’s conviction because the State failed to establish a proper foundation qualifying the | ^officer to testify as an expert in the field of narcotics, where the basis of the officer’s expertise, such as amount of time he had been with the police force or with the narcotics division, was not disclosed. Moreover, this court indicated that the officer’s testimony that “the quantity is possession with intent to distribute”, was in effect an opinion as to the defendant’s guilt.
In State v. Dabney, the defendant’s conviction was reversed because the expert gave an-opinion as to whether a person in possession of an exact number of “sets of Ts and Blues” (i.e. the same number of sets as was taken from the defendant) was possessing them for personal use. This Court found that the expert, who had already testified to the packaging and marketing of “Ts and blues” on a wholesale level, had given the equivalent of a direct statement that the defendant possessed the drugs with the intent to distribute.
In this case, during examination by the State, Officer O’Neal testified that he had been on the police force for twenty-four years. For half of those years, he was a narcotics detective and participated in excess of several thousand narcotics arrests. He has interviewed numerous drug users and dealers, and is very familiar with and knowledgeable of the street methodology of packaging and distribution of narcotics, as well as items used in preparation of narcotics for retail sale. Based upon Officer O’Neal’s background, the trial court qualified him as an expert in the packaging of narcotics for retail distribution. The State proceeded to question the officer l^as an expert. Officer O’Neal explained that his testing and quantifying the evidence indicated that the officers seized in excess of seventy-five grams of cocaine from the defendants. He further testified that the scales, baggies, and glass tubes confiscated in the investigation are commonly used in the retail sale and packaging of street level narcotics, particularly crack cocaine.
Officer O’Neal’s testimony assisted the jury in understanding how cocaine is packaged for retail sale. Such testimony was helpful to the jury because of their lack of exposure to narcotics trafficking. The officer’s testimony merely assisted the jury in its determination. Unlike the testifying experts in Montana, Wheeler, White, Evans and Dabney, Officer O’Neal did not give the jury an opinion as to the defendant’s guilt or innocence, only that the paraphernalia confiscated in the case was consistent with paraphernalia used in narcotics distribution. The officer’s testimony assisted the jury in determining whether defendant’s denial of guilt was credible. As such, it does not appear that the trial court erred in qualifying the officer as an expert and allowing him to testify as the packaging of narcotics for retail sales. This assignment is without merit.
*418 CONCLUSION
The defendants’ convictions are affirmed, and Terrance Johnson’s sentence is affirmed. However, we reverse Harris’ sentence of life imprisonment for his conviction for count one of the indictment, possession with intent to distribute, since it was not included in the state’s multiple bill.
li>gFor these reasons, we remand Harris’ case for sentencing as to count one.
CONVICTIONS AFFIRMED, JOHNSON’S SENTENCE AFFIRMED, HARRIS’ SENTENCE AFFIRMED IN PART AND REVERSED IN PART, CASE REMANDED

. Greg A. Morris and Mario A. Breedlove were also charged in count one with posses *407 sion with intent to distribute crack cocaine. This appeal, however, pertains only to Russell Harris and Terrance Johnson.

. Counsel is under the mistaken impression that the defendant pled to possession of a firearm while in possession of a dangerous substance, LSA-R.S. 14:95, rather than attempt.